Armando Hilario **RUIZ,** Appellant,

v.

The **STATE** of Texas, Appellee.

No. 3–82–458–CR.

Court of Appeals of Texas, Austin.

May 8, 1985.

Terrence A. Gaiser, Houston, for appellant.

William M. Rugeley, Crim. Dist. Atty., for appellee.

Before POWERS, EARL W. SMITH and CARROLL, JJ.

PER CURIAM.

After a jury found appellant guilty of murder, the trial court assessed punishment at imprisonment for life. Tex.Pen. Code Ann. § 19.02 (1974). Because our examination of the record discloses an unassigned error of a fundamental nature, we must reverse the judgment of conviction. *See Carter v. State*, 656 S.W.2d 468 (Tex.Cr.App.1983).

This cause arises out of a shooting that occurred on May 29, 1981, at the Cherokee Cattle Company, a club in San Marcos licensed to sell mixed drinks. Shortly before midnight, Bobby Warren, a doorman at the club, saw appellant inside the club carrying a bottle of liquor. Because customers are not allowed to bring liquor onto premises licensed for the sale of mixed drinks, Warren approached appellant and asked him for the bottle. Appellant refused to turn the bottle over to Warren and also refused to accompany Warren to an area away from the main floor of the club.

Satisfied that appellant was not going to cooperate, Warren seized him by the head. When appellant began to curse and struggle with Warren, John Shelton, another doorman, grabbed appellant by the legs. Holding him in this manner, Warren and Shelton carried appellant, who was still struggling and cursing, outside the club. Once outside, Warren struck appellant's face and took the liquor bottle from him. Warren and Shelton then reentered the club.

Within seconds, appellant opened the door of the club, shouted "I'm going to get you, you S.O.B.," and shot Shelton twice with a .38 caliber pistol, from which wounds he later died. Appellant then ran, followed by several customers and employees of the club including the owner, Johnny Ripps. During the ensuing chase, appellant fired several shots at his pursuers. Appellant was eventually tackled in an alley and disarmed. Ripps testified that when captured, appellant repeatedly shout-

ed that he was "crazy" and did not know what he was doing.

The testimony of the various witnesses unequivocally indicates that appellant never left the doorway of the club after being thrown out by Warren and Shelton, and that he fired the fatal shots immediately after the two doormen left him. This tends to confirm other testimony to the effect that appellant was armed while inside the club.

■ In its charge at the guilt/innocence stage, the trial court instructed the jury on the lesser offense of voluntary manslaughter. Tex.Pen.Code Ann. § 19.04 (1974). While appellant did not testify at this stage of the trial, the trial court is not restricted by the testimony of the accused on his own behalf in determining the issues to be submitted, and should submit each and every phase of the case suggested by the evidence as a whole. *Lugo v. State,* 667 S.W.2d 144 (Tex.Cr.App.1984); *Christian v. State,* 71 Tex.Cr.R. 566, 161 S.W. 101 (Tex.Cr.App.1913); *Pennington v. State,* 644 S.W.2d 64 (Tex.App.1982, pet. granted). If there is evidence raising the lesser included offense, the trial court should submit the charge. *See Day v. State,* 532 S.W.2d 302 (Tex.Cr.App.1975); *Pennington v. State, supra.* This is so whether the evidence is strong, feeble, impeached or contradicted. *Campbell v. State,* 614 S.W.2d 443 (Tex.Cr.App.1981); *Warren v. State,* 565 S.W.2d 931 (Tex.Cr. App.1978). In the present case, the testimony would have reasonably supported a verdict of guilty of voluntary manslaughter, and the trial court was correct to charge the jury on the lesser included offense.

■ When, in a prosecution for murder, an issue is raised whether the defendant acted under the immediate influence of sudden passion arising from an adequate cause, the State must prove the absence of such influence beyond a reasonable doubt

in order to establish murder. *Bradley v. State,* 688 S.W.2d 847 (Tex.Cr.App.1985); *Braudrick v. State,* 572 S.W.2d 709 (Tex. Cr.App.1978). In such a case, the trial court commits error if it omits this "implied element" when applying the law of murder to the facts of the case in its charge to the jury. *Cobarrubio v. State,* 675 S.W.2d 749 (Tex.Cr.App.1983). In *Jenkins v. State,* Nos. 64,000–64,004, Tex.Cr.App., February 16, 1983 (not yet reported), the court held such error to be "fundamental," and hence not waived by a failure to object. In the instant cause, the charge contains *Cobarrubio* error to which appellant did not object.[1]

In *Almanza v. State,* 686 S.W.2d 157, Tex.Cr.App., 1985 the court substantially altered the law of fundamental error in the jury charge. An error in the charge to which no proper objection was made at trial will now result in reversal only if the error was so egregious and created such harm that the accused did not have a fair and impartial trial. The degree of harm must be assayed in light of the entire charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. The record must reveal actual, not just theoretical, harm to the accused, and no error in the charge requires "automatic" reversal.

In *Huffman v. State,* 691 S.W.2d 726, Tex.App.—Austin, 1985, we applied the *Almanza* test for fundamental error in another case in which *Cobarrubio* error was present in the charge. Because the evidence in *Huffman* did not raise an issue whether the defendant acted under the immediate influence of sudden passion arising from an adequate cause, we held that the failure of the charge to properly place the burden of proof on that issue was not a fundamental error. In the instant cause, however, the evidence does raise the sudden passion issue and the error in the

1. This case was tried in November, 1981, over one year before the Court of Criminal Appeals

announced its decisions in *Cobarrubio* and *Jenkins.*

charge cannot be so easily dismissed. Accordingly, we have reviewed the record to determine whether the error denied appellant a fair and impartial trial. For the reasons hereafter discussed, we conclude that it did.

An examination of the charge as a whole reveals that the only reference to the sudden passion issue is found in that portion of the charge defining and applying the law of voluntary manslaughter, which the jury was instructed to consider after it had acquitted appellant of murder. The charge defined voluntary manslaughter in accordance with § 19.04, *supra*. The jury was then instructed, in the paragraph applying the law of voluntary manslaughter to the facts of the case, to convict appellant of the lesser offense if it believed, or had a reasonable doubt, that he acted out of sudden passion arising from an adequate cause. The jury was also instructed that if it believed appellant was guilty of either murder or voluntary manslaughter, but was unsure as to which, it was to find him guilty of the lesser offense. The arguments of counsel only briefly touched on voluntary manslaughter, and did not serve to clarify the sudden passion issue.

Were the record otherwise silent, a close question would be presented whether the error in the charge was fundamental. It could be argued that the charge as a whole, by instructing the jury that it was to convict appellant of voluntary manslaughter if it had a reasonable doubt as to whether he acted out of sudden passion arising from an adequate cause, indirectly placed on the State the burden of proof on the sudden passion issue. Thus, it could be further argued that the charge, while objectionable under *Cobarrubio*, was not so egregiously harmful to appellant as to constitute fundamental error under *Almanza*. We need not decide this question, however, because the record before us contains further evidence of harm to appellant.

After deliberating the issue of appellant's guilt for approximately three hours, the jury announced it had reached a verdict. The parties returned to the courtroom, and the following events took place:

THE COURT: The Defendant will stand to receive the verdict of the jury.

THE DEFENDANT: (Standing with Mr. Gonzales)

THE COURT: "We, the jury, find the Defendant guilty of the lesser included offense of voluntary manslaughter," signed David R. Olguin, Foreman.

Do you wish to have the jury polled?

MR. GONZALES: Yes, sir, Your Honor.

THE COURT: Ladies and Gentlemen, it is lawful for the Court to inquire whether this is the verdict of each individual juror, and for you to affirm that fact. You gentlemen may be seated.

Is this your verdict, Mr. Olguin?

JURY FOREMAN OLGUIN: Yes, sir.

THE COURT: Mr. McCracken, is that your verdict?

JUROR McCRACKEN: (No reply)

THE COURT: Mr. McCracken, is that your verdict, verdict of voluntary manslaughter?

JUROR McCRACKEN: Is that my verdict?

THE COURT: Yes, sir.

JUROR McCRACKEN: (No reply)

THE COURT: Yes, sir, is it the individual verdict of each of these jurors that this Defendant has been found guilty of voluntary manslaughter?

JUROR OLGUIN: (No reply)

THE COURT: Yes or no, sir?

JUROR OLGUIN: I don't understand that.

THE COURT: All right, let me explain to the jury what we are doing.

The verdict of the jury signed by the Foreman indicates that you have returned a unanimous verdict of the lesser included offense of voluntary manslaughter, that each of the twelve of you have voted to return that verdict. It is now lawful for me to inquire that is the individual verdict of each of you.

All right, now, then, how many of you have voted for voluntary manslaughter, raise your hand, please.

THE JURY: (Two hands raised)

THE COURT: All right, therefore, I take it that the others have not agreed to that verdict and therefore the certificate of the jury will be rejected by the Court and the jury will be instructed to return to the jury room to further deliberate on this case. As contained in your instructions, Ladies and Gentlemen, it is absolutely unacceptable for you to return anything less ...

Let me rephrase that. You must and can only return a verdict if it is the unanimous vote of all twelve of the jurors, all twelve of the jurors must agree to whatever verdict that you return, whether it be not guilty, whether it be guilty of murder, or whether it be guilty of the lesser included offense of manslaughter, of voluntary manslaughter.

Now, we will have to prepare a new verdict certificate for the jury. Would you now move back to the jury room, Ladies and Gentlemen, and continue your deliberations.

Shortly after returning to the jury room, the jury sent out a note asking for "further interpretation of page 7" of the charge. On this page, the trial court instructed the jury that if it found beyond a reasonable doubt that appellant was guilty of either murder or voluntary manslaughter, but had a reasonable doubt as to which, it was to resolve the doubt by finding appellant guilty of the lesser offense. In reply to this request, the trial court instructed the jury to *"carefully* reread Page 7 of the Charge."

One hour and fifteen minutes after the jury had resumed deliberations following the trial court's refusal to accept the voluntary manslaughter verdict, deliberations were concluded for the night. The following morning, after two more hours of deliberations, the jury returned its verdict finding appellant guilty of murder.

■ The course of the jury's deliberations is clearly reflected by the original, non-unanimous voluntary manslaughter verdict and the request for clarification of that portion of the charge explaining how the jury was to decide between murder and voluntary manslaughter when it was satisfied appellant was guilty of one or the other offense. Obviously, the jury believed appellant committed a crime when he shot John Shelton, but was unsure whether the crime he committed was murder or voluntary manslaughter. It is also obvious that the jury was unsure how it was to resolve this uncertainty. In this light, the failure of the charge to properly place the burden of proof on the sudden passion issue looms large. Had the charge correctly instructed the jury that, to establish murder, the State had to prove beyond a reasonable doubt that appellant did not act under the immediate influence of sudden passion arising from an adequate cause, it is possible the jury would have returned a different verdict. Under the unusual circumstances of this case, we must conclude that the error in the charge denied appellant a fair and impartial trial and was, therefore, fundamental. *Almanza v. State, supra.* See also *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

■ We have reviewed the three grounds of error contained in appellant's brief and find them to be without merit. Contrary to appellant's contention, the trial court did not err in refusing to accept the verdict of guilty of voluntary manslaughter. The poll of the jury revealed that McCracken and other jurors dissented from the verdict. Tex. Code Cr.P.Ann. arts. 37.-04 and 37.05 (1981); *Jones v. State,* 511 S.W.2d 514 (Tex.Cr.App.1974). We further find that the trial court, when retiring the jury for further deliberations, neither directed a verdict of guilty of murder nor commented on the weight of the evidence.

■ The record also contains a *pro se* brief raising an additional ground of error. There is no right to hybrid representation. *Rudd v. State,* 616 S.W.2d 623 (Tex.Cr. App. 1981); *Landers v. State,* 550 S.W.2d 272 (Tex.Cr.App.1977). The *pro se* brief, therefore, presents nothing for review. An

examination of the contention asserted therein reveals no error that should be considered in the interest of justice.

The judgment of conviction is reversed and the cause remanded to the trial court for a new trial.